Barbara Nador v. Workers' Compensation Comm'n 5-10-0409 Counsel, please. May it please the Court. Good morning, Your Honors. My name is Brian McGovern. I represent Petitioner Barbara Nador in this case. The Petitioner asks your consideration of the following question. Is her labor market reasonably stable when she is offered only one full-time job after an extensive job search, and that job is offered by the respondent two weeks before trial? The Petitioner wasn't too overly impressed with the efforts that your client put forth in her job search, were they? In this case, actually, she did a job search and it went up. How did she manage to score a zero in the typing test? Of course, I wasn't there. A four-year-old could score something. Obviously, she does not know how to type and it's some sort of hunting test. Doesn't know how to type? Typed every one of her job applications? Has a college degree? Has familiarity with computer skills? How does she do that, by voice? She did testify that her mother did the vast majority of her typing. She also testified she did the hunting test. I don't know how you would do that. You have to try to get a zero. Again, there's no doubt that scoring zero on a typing test presents a problem, but that doesn't necessarily negate the overall situation that exists in this case. She was applying for jobs she wasn't qualified for. I'm sorry? She was applying for jobs she wasn't qualified for. The typing test came up with... I believe that was the Epilepsy Foundation of St. Louis. And, of course, she had testified that the job required 50 words per minute. The vocational counselor was not aware of that. The vocational counselor then testified that she did verify that there was a typing requirement for the job. The vocational expert further testified that she did not verify or not verify whether it was 50 words per minute or not. It is as a result of that that the typing test came up, and June Blaine, their vocational expert at that time, brought her into Ms. Blaine's office to conduct the typing test. What did Slace and Blaine testify as to the reason why her job searches were unsuccessful? I don't remember what Slace testified to too much. I do know that June Blaine, at the second trial, testified that she felt that the petitioner wasn't looking in the right places. I don't know what to make of that, other than the fact that I find it hard to believe that, of all the contacts she made, some 2,000, and, of course, all the follow-ups, that she could not have been looking in the right places, or some of them certainly had to be the right places. She had numerous interviews. If you get an interview, I would assume that you're pretty, if you're not at the right places, you're close to the right place. Most of them, in essence, without going over individual instances, both, as I read it, Slace and Blaine testified, essentially, that your client's job search was unsuccessful because she really wasn't motivated and concentrating and getting a job, and she wasn't cooperative. Both of them, in essence, did not paint a very good picture of your client's attempts to find a job, did they? No. I mean, and I'm not going to get into the self-serving notion of a vocational expert hired by the respondent, but I will say this. I find it interesting that the commission, in the first date or case when they remanded back for more job search, they specifically noted that her job search had been very well done, that she had been cooperative, so on and so forth. So I, and if you just look at the quality and the quantity of the petitioner's job search, I just don't think that you could, I think it's not fair to say that she wasn't cooperative and didn't make a strong effort. Whose burden is it to prove that the claimant is entitled to fall into the ad-lock? Prove a diligent but unsuccessful job search. That's the claimant's burden, correct? Correct. Well, I mean, what happens is once they prove that, then the burden shifts over to the respondent. I mean, the thing about this is, and this is why I think that this court has ample support to find in this particular case that this one job offer by the respondent two weeks before trial, that there was no reasonably stable labor market for her, that there was, first of all, this woman was permanently restricted as per a functional capacity evaluation to sedentary work with the additional restrictions of no kneeling, crouching, climbing, and a sit-stand at alternate 15 minutes. I mean, that alone severely restricts her labor market. Well, that would severely restrict anybody's labor market, but certainly that alone severely restricted her labor market. If you... The other thing about this job that the respondent offered her two weeks before trial was this particular job was open two times prior to it being open two weeks before trial, in September of 2007 and then again in April of 2008. They did not offer her that job at that time. Moreover, again, and I think this is important, is when the respondent interviewed the petitioner for the QIA job, which is the one they offered her, they did not bring up to her at all the fact that she had a worker's comp case, that she was undergoing vocational rehabilitation, that she had permanent restrictions. They interviewed only one client. They offered her the job the next day. The two witnesses for the respondent who talked about the interview process and getting the job, both of them testified that we look internally first, and if we don't find an internal candidate, then we go external. Is it your position, in essence, that this job offer was a sham? Is that what you're alleging? Because the commission dealt with that issue, I thought, directly. I like the words you use, Your Honor, and the answer is yes. The offer of employment, I believe, was a sham. I'm not saying the job was created, but the job was a sham. The case law that we're all familiar with, it talks about the job themselves being shams, meaning the position was created to avoid the award that a respondent would want. In this case, there's no doubt the job is legitimate. Right, because somebody was hired the next day once you turned it down. That's right, and somebody was working, two people were working prior. But the offer of employment in this case was not genuine. And other than the personal beliefs of the claimant, what is that based on? If you read the entire record and all the facts that lead up to it and what the respondent's behavior in this case, I think that it's pretty clear that the respondent made this offer at the 11th hour to avoid a permanent and total disability award. Why not take the job and continue the case and see how she does? I mean, it might have turned out she couldn't do the job, and that may have been apparent in 30 days. Needless to say, that was thoroughly discussed. The primary reason that the petitioner did not take the job was, the question was, was her recourse going to be here, like right now today, what we're doing, or what recourse would she have if she had taken the job, the case was concluded, and then her employment was terminated? A petitioner in those circumstances has no recourse. So my answer to Your Honor is that we were cognizant of the fact that of the behavior of the respondent, how this case had progressed, it had gone up to the commission, back down, the job search, three different bulk experts, etc., and we were very concerned that the case would have been concluded, that she would have been terminated, and then she would have no recourse at that point in time. So she made a conscious decision to roll the dice on whether or not it would be determined that the job offer was a shame? She didn't roll the dice to see if the job offer would be a shame. She rolled the dice to determine whether or not her labor market was stable, as that term is defined, or should I say not defined in the law, versus what options she would have if it turned out that they terminate her. Again, because there's no doubt here that the job itself existed, that had actual people working in it, but it's the offer of employment to this particular petitioner. And incidentally, in all these permanent total cases and odd lot cases, and we're talking about reasonably stable labor market, we're always talking about this petitioner's labor market, not all petitioners' labor market. We have to talk about this particular petitioner's labor market. Certainly, though, it puts an employer in a pretty powerful position to be able to come in and say, we offered her a job. She wouldn't take it. I mean, you know, you can argue all the other, she can't find a job anywhere else, but in meeting their burden of showing that there is a job market for her. No doubt about it. And I will tell Your Honor that not only can they do it after they were found to be liable for a permanent total once, went up to the commission, comes back down, eight more months of a job search, another 1,000 contacts, they can do that the morning of arbitration. They can do it at any time. And I don't think, particularly in this case, I don't think that this behavior should be condoned. I mean, to a certain extent. We're operating on two different levels here. We're focusing on this job that you're alleging, or at least arguing was not a legitimate offer. Setting that aside, you still have the problems with the history leading up to that and the vocational experts saying she wasn't searching for a job or making a diligent effort even long before that, right? You still have that evidence in the record. Again, I understand what the respondents, vocational experts testified to, two of the three that they had hired. I mean, let's keep in mind that before the first trial, literally one week before the first trial, they terminated their first vocational expert and then moved for a continued investigation. But where are we viewing that? Where are we viewing the subsequent hearing? My reason for stating that is that I believe that the importance is that we understand what the respondent's objective is and what the vocational expert's objective is, and that is to find this employee a job, so on and so forth. Let's assume you're right. There's some kind of a bias there. I think that's always a legitimate argument. From our standpoint, as you know, the test is, quote, unquote, is there some evidence in the record to support the commission's finding? And if you've got these experts, as biased as you're arguing, doesn't it constitute evidence in the record to support the respondent's position, the commission's decision? It does, and as in all cases, there's going to be evidence in the record to support both positions. But I do think that there's also ample evidence in the record to support the petitioner's position. I mean, after all, in her opinion, she made a diligent job search. Well, not only in her opinion, but all her job search records are actually in the record, and she actually did make contact with all these employers. She actually did go to actual interviews. She actually did follow up with employers seven or 800 times. I mean, after all, vocational expert after vocational expert will testify that that's a very important part of the vocational process. So why didn't she do her job? Because, well, number one, her permanent restrictions severely restricted her labor market right off the bat. I mean, she's restricted to sedentary duty, alternate sit-stand. So that alone, her labor market is severely restricted. But in addition to that, of course, at the time, the labor market was not plentiful. But the primary reason is that in her particular case, it was her physical restrictions as put forth by an FCE. And why she didn't find a job, I don't know, because her labor market wasn't stable. I mean, it was, in fact, not stable. What your position is is that one job offer does not prove a stable labor market for a person with these restrictions, doesn't it? My argument, Your Honor, is that in this particular petitioner's case, this one job offer does not show a stable labor market. Maybe in another case it would, but not in this particular case. Let me just say, I also believe that this is critical. If this job offer had come from someone other than the respondent, that was significant. I mean, the respondent came up with this job offer two weeks before trial. And I guess it's uncanny, but that it just so happened that the petitioner or the person for the respondent who was working that position happened to quit or move on two weeks prior to trial. I don't know. There was no testimony about that. But I am restricting it to this particular petitioner under these particular facts of this case. Okay. But let's take that there was a job, this job, B, was available, but not from this employer. Would that, with the efforts, the diligent efforts that you claim your client had engaged in, would that one job opening establish a stable labor market? I think arguably you could argue no, but I will tell you that in this particular case, had that happened, she would have taken that job. Thank you. Counsel, please. Good morning. May it please the Court, Counsel. I'm Julia McCarthy on behalf of the Appalachian Family Services. It is our position that the arbitrator, the Illinois Workers' Compensation Commission, and the Circuit Court were correct in this matter and the decision should be affirmed. As Counsel has noted, this is a manifest way issue here, and it is our position that there is ample evidence within the case to support the decision of the Commission as well as the Court. Now, Counsel is arguing that his client is permanently and totally disabled in this matter. He has laid out the criteria in his brief, finding that, one, either you have to have medical evidence, which nobody in this case states there is medical evidence. No doctor has said the person can never work again. You then look to, is the person an odd-lot permanent total? In other words, is there no reasonable, stable labor market? In this case, that can be shown, or in any case, you would look to, has the person made a diligent and unsuccessful job search? And in this particular case, I would say the answer is no to both of those criteria. I would say... Well, at least the first arbitration, the arbitrator determined that she had, and the Commission in the first field of the Commission had no problem with her job search at that point in time. Do you agree with that? I would agree with that. They said that, you know, but they said you need to extend it because at that time it had been about six months and the vocational assistants at that time had been telephonic and not within the geographic area, realizing that that was not working. The employer took it upon themselves to hire a vocational assistant who was on-site, so to say, or within the same geographic area, more familiar with the area. And no one found it that within, as the economy is, for someone to search for a job for six months certainly is not unheard of in these states. Now, once the... And I will say, also, after the first decision, which I believe the trial was in February of 2007, with the arbitrator at that time, the petitioner testified that she was going to continue her job search, absolutely. Within a week or so after that trial, she contacted the vocational assistant, who was now the on-site, so to say, the geographically located, and said, I don't need any more help, I'm done, I'm not looking. The petitioner in the second trial then admitted that for one year she made absolutely no effort to find a job. I think that was probably strike one. If you look at the arbitrator's decision from the second trial, she went into great detail as to why she did not find the job search legitimate and diligent. She found that a year without any efforts by the petitioner was definitely a red flag and questionable as to her real intent to look for a job. She made no efforts for a year? Correct. Between about February of 2007 and February of 2008, when the case was then remanded. Despite her testimony in February of 2007, that she intended to continue on in her job search, she admitted in the second trial that she had made no efforts. There was some suggestion that that affected her credibility, too, or the credibility determinations of the Commission, right? Correct. Because when they first remuted it, they kind of said, gee, she was so adamant she really wants a job and she's going to keep looking. Maybe we should help her find one by remanding this and giving her more time. In the meantime, she'd spend a year quit looking. Exactly. That's what happened. Exactly. And in the second trial, one of the vote person's slaves did say that right there that would be also a red flag to prospective employers of, well, what have you been doing over the last year when you have those gaps in your resume and that type of thing. Further, as it's been noted, I believe, the arbitrator also noted relying on the testimony of the vocational consultants, the two of them, that Petitioner was applying for jobs that were not within her restrictions or just not appropriate jobs for her. She wasn't available. One of the vote consultants, June Blaine, testified she was hard to get a hold of. You couldn't get a hold of her by phone. By email, usually she wouldn't respond, that type of thing. She wasn't following up. Yes, you can send out a lot of contacts to employers to pay for things and say, I'm looking for a job, look at all of these resumes that I sent out, type of thing. You send them out blind, you don't follow up. There's probably numerous other people applying for that same job that are making the follow-up call and they're trying to make some personal contacts. Out of all those contacts that she had, she had nine personal interviews, despite claiming she had sent out thousands of resumes. So the arbitrator found it very difficult to believe that Petitioner was being diligent in her job search, which she did note in her second decision and went into some detail about that. Further, it was pointed out in the commission decision, in the second commission decision, that as far as this was not a legitimate job offer, that this was speculation on behalf of the Petitioner. How could she know that? And when you look at the history of this job that was offered, Petitioner admits the job is not sham. The job is legitimate. The job was created in September of 2007. The employer had a need. At that time, Petitioner wasn't even looking for a job, when you look at the timeline here. So obviously it wasn't created for her. No, absolutely not. And it was hired, somebody was hired for that job, remained in that job, the initial hiree was in that job, through April of 2008. An internal person was then hired to replace the person who left in April of 2008. That person resigned the position in June of 2008. So this position didn't open up again until June of 2008. Petitioner was hired in July of 2008. So that's the timeline in coming up to, there was a trial in August of 2008. But this is the timeline of this actual position. What did the Petitioner do before she was injured? Before she was injured, she was a counselor with the youth at Royalton. A college graduate? I'm sorry? She was a college graduate, did I hear? Oh yes, she has two degrees. She has a degree in psychology, she has a degree in sociology, and she also has an associate's degree. Does she have computer skills? According to the person that she used to work with and would have been her supervisor on this job, she was considered a good employee and there was never any complaint about her work, and yes, that she had used a computer in that. So the zero typing. How did she score a zero on the typing test? I can only speculate that she didn't try or she sabotaged the test. It's hard to come up with zero. Under 50 words, I'm not saying there aren't plenty of people, probably myself included, it's under 50 words, but I managed just fine as far as emails and computer and that type of thing. So to go in, if she had gone in and didn't make 50 words a minute, would I say she sabotaged the test? No. But if you make zero, that's the inference? That makes you question. Is there anything in the record about how these typing tests are scored? I mean, if you get below a certain level, is it deemed zero? I do not. To me, the only way to get zero is you sit and you don't have any teeth. I'm thinking there may be some level at which they say, well, that's the equivalent of zero. I would think if you misspelled it. I mean, you could type something but misspell everything. But just to come up with actual zero and not score one point for one word would be difficult, I think. And that was another thing that I think was pointed out in the decisions throughout that made her efforts or lack thereof. Was there any offer or opportunity to take this test again? Not that I know of. And the other thing that I will say the vote counselor said, that she didn't follow up. For instance, I think it was her cross position. She just deemed it, well, I don't want to do that because it's temporary, so I'm not even going to follow up. And to say that there are no other job offers, well, it's hard to get a job offer when you don't follow up. You can put it out there, but if you don't show interest, don't respond at the appropriate times, then no, you're not going to get a job offer. So I think throughout the record, it is where the petitioner was not making a diligent search. And the other criteria to take into account is age, education, and training. Certainly education is not an issue here. Someone who has two college degrees and an associate's degree. As far as training, she had been employed before. So I don't think there's anything to support permanent and total disability in this matter. There was a legitimate job offer made by the employer. The petitioner herself removed herself from the job market for one year after she had been awarded the first award. She then subsequently, there's no indication that she continued to need job search. She was offered a job, and she said, no, thank you. She didn't try. She just decided, no, I don't want the job. It's our position that the arbitrator, the commission, and the Supreme Court were correct. And certainly there is, as I said, ample evidence to support the decision. Any other questions? Thank you, Kathleen. Thank you. Of all the subtleties of litigation in a case like this, this whole notion that the petitioner did not look for a job after the first trial, but before the case was re-landed by the commission is the one that surprises me most. First of all, she did not say that she was supposed to be a permanent employee. All she didn't do was look for a job with the vocational expert. She won the case. She received a decision from the arbitrator that said she was permanently and totally disabled, and in the hindsight, she's getting criticized by subsequent courts that she didn't continue on with vocational rehabilitation. Didn't she testify, though, in the first arbitration hearing, that no matter what happened, she was still going to keep looking for a job that she wanted to work? Wasn't that her testimony? I know, but then she didn't do that. She did look for employment during the one year, but that was on her own. It wasn't formal underneath the rubric of the formal vocational rehabilitation. Did she testify to that, though? Did she produce job search materials? I do not believe that there was any job search. It's certainly not to the extent that when she was under formal vocational rehabilitation. The other thing about it is the 50 words per minute job. Again, I understand the concerns about zero words per minute, but if you look at the overall context of this case and the efforts that the petitioner did make and documented, would the court have a huge problem if she had tested 10 words, or 15, or 20, but she still couldn't get the job that was required 50 words per minute? There would be evidence of the fact that she was making a diligent attempt. The inference in zero was completely the opposite. Are we going to take... Let's just assume, for purposes of discussion, that in this one instance, she didn't try hard enough. Are we going to take that one instance and turn that into an overall lack of effort? No, because if that was the only instance, I don't think I would agree with it. With regards to some of the things that were brought up on counsel's argument, the relatively recent case of the Ameritech case, here we had a gentleman who refused to have surgery. He obtained his own MBA while he was receiving conservative treatment, and the court found him to be disabled. Again, I think that the Ameritech case, not just because there was a college education and the circumstance, but here again, my reading of all these odd lot cases and all the cases that come to... The reason there's no definition for a reasonably stable labor market is because one definition can't fit all the petitions. And I think that in this particular case, the petitioner myself would ask this court to find that in this petitioner, in this case, under her circumstances, that there was no reasonably stable labor market. And I thank you. The court will take the matter under advisement for this position.